IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD D. PARKELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-412-SLR |
| | ) |
| CARL DANBERG, et al., | ) |
| | ) |
| Defendants. | ) |

Donald D. Parkell, Howard R. Young Correctional Institution, Wilmington, Delaware, Pro Se Plaintiff.

Devera Breeding Scott, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.  Counsel for State Defendants.

Chad J. Toms, Esquire, Whiteford, Taylor & Preston, L.L.C., Wilmington, Delaware. Counsel for Correctional Medical Services, Inc., Christina Damron, and Betty Bryant.

Scott G. Wilcox, Esquire, Whiteford, Taylor & Preston, L.L.C., Wilmington, Delaware. Counsel for Correct Care Services LLC.

**MEMORANDUM OPINION**

Dated: February 25, 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Donald D. Parkell ("plaintiff"), an inmate at the Howard R. Young

Correctional Institution, Wilmington, Delaware, filed his complaint pursuant to 42 U.S.C.

§ 1983.[1]  He proceeds pro se and has been granted leave to proceed without

prepayment of fees.  Presently before the court are defendants' motions for summary

judgment and plaintiff's oppositions thereto.  (D.I. 222, 224, 226, 237, 240, 242)  The

court has jurisdiction pursuant to 28 U.S.C. § 1331.  For the reasons discussed, the

court will grant defendants' motions for summary judgment.

## II. PROCEDURAL AND FACTUAL BACKGROUND

This case proceeds on the complaint (D.I. 2) and the first amended complaint

(D.I. 66).[2]  During the relevant time-frame, medical contract service providers

---

[1]When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. *West v. Atkins,* 487 U.S. 42, 48 (1988).

[2]When the court screened the original complaint it dismissed: (1) "IV. Parties," paragraphs twelve through sixteen and twenty; (2) "VI. Statement of Facts," paragraphs twenty-seven through thirty-two and thirty-five; (3) "VII Causes of Action/Claims for Relief," paragraphs sixty-three through sixty-five, sixty-eight, sixty-nine, and seventy-four; and (4) defendants Lieutenant John Doe, Sergeant John Doe, Brian Kuhner, Ms. West, Maintenance Supervisor John Doe, Dr. Baeder, all claims related to tier flooding, and all medical negligence claims.  (D.I. 8, 121)  Plaintiff was allowed to proceed against several defendants including Captain John Doe who has never been identified or served.  He will be dismissed as a defendant.  Plaintiff's amended complaint added defendants Correct Care Services, LLC, Mental Health Management ("MHM"), Allen Harris ("Harris"), John Doe Medical Director for Correctional Medical Services, Inc., and John Doe Medical Director for Correct Care Services, LLC.  (D.I. 66)  MHM and Harris have since been dismissed. (*See* D.I. 133)  During his deposition, plaintiff indicted that he "dropped" his claim against the Doe Medical Director for Correct Care Services.  (D.I. 412, ex. 1 at 69)  To date, neither Doe medical director has been identified or served.  They will be dismissed as defendants.

Correctional Medical Services, Inc. ("CMS")[3] and Correct Care Services, LLC ("CCS")
provided medical care to the Delaware Department of Correction ("DOC").  Also during
the relevant time-frame, plaintiff was housed at the James T. Vaughn Correctional
Center "VCC"), Smyrna, Delaware.  Count I alleges that Commissioner Carl Danberg
("Danberg") violated plaintiff's Eighth Amendment rights when he: (a) renewed a
contract with CMS as a means of saving money knowing of CMS' failure to provide
constitutionally adequate care to inmates at the VCC; (b) chose to retain CCS as the
new medical care provider; and (c) implemented or maintained policies or practices that
denied or delayed necessary medical and mental health needs.  (D.I. 2, ¶ 75, D.I. 66, ¶¶
82, 87)  Plaintiff also sued Warden Perry Phelps ("Phelps"), Major Michael Costello
("Costello") as security chief, Deputy Warden David Pierce ("Pierce")[4] as responsible for
security matters, and Deputy Warden Christopher Klein ("Klein") as responsible for
medical issues, all of whom allegedly subjected plaintiff to cruel and unusual
punishment by implementing, maintaining and/or acquiescing to policies, practices or
customs that deprived plaintiff of medical or mental health care, basic human
necessities, and undue pain and humiliation.  (D.I. 2, ¶¶ 70-73, 77, D.I. 55, ¶¶ 83-85,
87)  Plaintiff sued CMS and CCS for violating his Eighth Amendment rights when they
enacted policies, customs, or practices with regard to plaintiff's medical and mental
health treatment and care.  (D.I. 2, ¶ 76; D.I. 66, ¶¶ 68-75, 77, 87)  Finally, plaintiff sued
Nurse Betty Bryant ("Bryant") for allegedly violating his Eighth Amendment rights when

---

[3]CMS is now known as Corizon, Inc.

[4]Pierce is the current warden at the VCC.

2

she refused to examine his infected arm and provide needed treatment (D.I. 2 at ¶ 66), and Nurse Chris Damron ("Damron") for allegedly committing assault and battery under Delaware law when she maliciously twisted and yanked plaintiff's arm through a door slot causing immense pain and contributing to his preexisting condition (D.I. 2 at ¶ 67). Count II alleges that Danberg, Phelps, Pierce, Costello, Captain M. Rispoli ("Rispoli"), Klein, CMS, and CCS violated plaintiff's due process rights under the Fourteenth Amendment by refusing to treat him while he was housed in isolation and  housed him in atypical conditions in the infirmary.  (D.I. 2, ¶¶ 79-80, D.I. 66, ¶ 89)  Plaintiff seeks compensatory and punitive damages, as well as injunctive relief.

CMS provided medical services to the DOC from July 1, 2005 through June 30, 2010. *See Williamson v. Correct Care Services LLC*, 2010 WL 5260787, at n.4 (D. Del. Dec. 16, 2010).  Plaintiff was injured on January 1, 2009.  (D.I. 228, ex. 1 at 78; D.I. 238 at A284)  At the time, he was housed in Building 17 at the VCC.  (D.I. 228, ex. 3 at B404)  The maximum security housing units at the VCC, including the Secured Housing Unit ("SHU"), consist of Buildings 17, 18, and 19.  (*Id.* at ex. 3, ¶ 2)

Plaintiff was transported to the Kent General Hospital in Dover, Delaware and received treatment following complaints of back and right hand pain.  (D.I. 225, A189, A192-201)  X-rays taken were normal with the exception of a lumbar spine x-ray which indicated loss of normal lumbar lordosis possibly due to muscular strain.  (*Id.*)  Hospital records note possible muscle sprain, positive for tenderness to palpation, with no visual abnormality.  (*Id.* at A196)  Plaintiff was discharged from the hospital and returned to the prison infirmary.  (*Id.* at A326)  While in the infirmary, physician's orders dated January 4, 2009, instruct that plaintiff's ace wrap should be removed b.i.d. (i.e., twice a day) and

3

that he should be encouraged to stretch and exercise his fingers for two weeks. (*Id.* at A273)

Damron, who provided plaintiff with physical therapy, saw him on January 6, 2009, noted "some popping of hand when exercising," and questioned whether a new x-ray was needed. (*Id.* at A324) Damron provided physical therapy the next day, January 7, 2009. Because a correctional officer was not available, she performed the physical therapy through the cell door flap. (D.I. 223, ex. C at ¶ 7) Damron states that the physical therapy was performed correctly and in an appropriate manner. (*Id.* at ¶ 7) Plaintiff testified that Damron "snatched my arm, I guess to try to do [the exercise], or maybe she was just yanking it to be vindictive. I don't know. All I know is she yanked and my arm was hurt at the time." (D.I. 228, ex. 1 at 81-82) Plaintiff testified that the incident with Damron caused pain, but no injury or damage. (*Id.* at 85-86) Damron states that she did not intend to hurt or cause harm to plaintiff while assisting him in the range of motion exercises. (D.I. 223, ex. C at ¶ 9)

Plaintiff submitted a grievance on January 8, 2009, complaining of lack of heat in the infirmary. (D.I. 238 at B1) According to Pierce, around 2009 there were problems with the heating system for the infirmary, but there was never a time when there was no heat for any extended period of time. (D.I. 228, ex. 2, ¶ 8) When the air handlers were being re-engineered and construction was in progress, it was common practice to provide inmates in the infirmary with extra blankets and, when there were heating problems in the unit, an inmate in the infirmary would receive an extra blanket upon request. (*Id.*) There was no policy that prevented an inmate from receiving an extra blanket. (*Id.*)

4

Plaintiff was discharged from the infirmary and returned to his housing assignment in the SHU. On January 9, 2009, he submitted a sick call slip complaining that his back and hand were "still hurting excruciatingly. The pain medication dulls it slightly, but not enough. I can't take this pain." (Id. at A302) Plaintiff was seen by Nurse Bryant on January 12, 2009. (Id.) Plaintiff testified that he requested treatment and medication for an infection in his elbow from Bryant, and she refused.[5] (D.I. 228, ex. 1 at 89-90) According to Bryant, she examined plaintiff, saw no evidence of an infection, took his vital signs, and discussed his complaints. (D.I. D.I. 223, ex. D, ¶¶ 4-6; D.I. 225 at A302) The plan included an x-ray of the right elbow to rule out a fracture.[6] (D.I. 25 at A272, A302)

Plaintiff testified that he was seen by a physician on January 16, 2009 after his arm "exploded" and a correctional officer called the doctor. (D.I. 228, ex. 1 at 166) The physician obtained a culture from the elbow and ordered antibiotics. (Id. at A272; A321) Test results indicated a staphylococcus infection. (Id. at A544) The same day, x-rays were taken of plaintiff's lumbar spine, right and left hip, pelvis, right elbow and right wrist. (D.I. 225 at A540-543) On January 19, 2009, a medical procedure was performed at the nurses station, the elbow was drained, cleansed and irrigated, and plaintiff was continued on antibiotics. (D.I. 225 at A321-322)

---

[5]Plaintiff submitted a grievance on January 17, 2009 complaining that Betty Burris failed to notify the physician of his pain and swelling and asked that she be trained in sensitivity. (D.I. 237 at B17) It is not clear if Betty Burris and Betty Bryant are one and the same.

[6]Dr. Desrosiers later ordered the x-ray.

5

Plaintiff complained of back, shoulder, right arm, and elbow damage and pain in January, March, April, May, July, November and December 2009.[7] (D.I. 238 at A181, A294-A302, A356, A372)  Plaintiff was seen by medical on January 12, 2009, February 4, 2009, May 20, 2009, August 6, 2009, and December 15, 2009.  (D.I. 238 at A294-A297, A300-A302)  On February 4, 2009, Dr. Desrosiers submitted a consultation request for plaintiff to see a neurologist to rule out nerve damage, and on August 19, 2009, he submitted a consultation request for plaintiff to see a physical therapist for an opinion and treatment.  (Id. at A185-86)

On November 4, 2009, plaintiff was transferred to the C-Building isolation unit in SHU, and he remained there until November 15, 2009.  (D.I. 225 at A318; D.I. 228, ex. 3, ¶ 9)  Plaintiff received a medical pre-segregation evaluation on November 5, 2009. (D.I. 225 at A318-19)  Examination revealed right elbow edema with puss drainage. (Id.)  A culture was obtained, and a physician contacted who prescribed an antibiotic. (Id.)  Plaintiff's elbow was irrigated and topical antiseptics were applied followed by gauze to secure the wound, and plaintiff was checked again about an hour later.  (Id. at A319)  Plaintiff was seen by mental health personnel on November 9, 2009.  At that time he complained of an elbow infection and that the nurses kept "blowing him off."  (Id. at A370)  The mental health note references a phone call to a nurse and that day plaintiff was seen by the nursing staff who noted the condition of his elbow, provided treatment and took a culture of the wound.  (Id. at A316, A370)  The culture was negative for staphylococcus.  (Id. at A539).  Plaintiff was seen by nursing staff the next

---

[7]On June 1, 2009, plaintiff was involved in a scuffle, fell on his right arm and hit his elbow.  (D.I. 238 at A318, A320)

day, November 10, 2009. (*Id.* at A315)  Physical therapy was scheduled for December

29, 2009.[8]  (D.I. 237 at B30)

Plaintiff testified that he was denied medical treatment while housed in isolation

because nurses are given the final decision whether an inmate needs treatment by a

specialist or physician.  (D.I. 412, ex. 1 at 108)  After his release from isolation, plaintiff

submitted a grievance complaining that he was refused soap, washcloths, recreation,

toothpaste and a toothbrush, and allowed only three ten-minute showers per week

which was the only time he was allowed to use soap.  (D.I. 237 at B39)  He also

complained that nurses and officers told him that he was not allowed medical treatment

while in isolation but, once out of isolation, he could fill out a sick call slip.  (*Id.*)  The

response to the grievance noted that certain items are not allowed in isolation due to

security concerns, and recommended education of nursing staff with regard to an

inmate receiving medical treatment while in isolation, noting that an inmate should not

be denied treatment.  (*Id.* at B40, B42)

For security reasons, inmates in isolation are strip searched three times per day,

once during each eight-hour shift by either a lieutenant or supervisor.  (D.I. 228, ex. 3 at

¶ 8; D.I. 240 at ex. A, Phelps Request for Admissions No. 8)  According to Rispoli, the

check of the inmate on each shift includes medical needs.  (D.I. 228, ex. 3 at ¶ 8)

According to Rispoli, there is no policy that prevents inmates in isolation from receiving

medical treatment.  (*Id.* 228, ex. 3 at ¶ 7)  Inmates in isolation can also submit sick call

---

[8]Physical therapy was scheduled after plaintiff submitted a grievance complaining
that he had yet to receive physical therapy.  An investigation revealed that an order for
physical therapy was written in August 2009 but there were no physical therapy
consultation and/or follow-up notes in the medical record.  (D.I. 237 at B330

slips and request medical treatment. (Id.) Inmates in isolation are provided with medical treatment and, if there is a need that warrants treatment in the infirmary, the inmate is sent there. (Id.)

Inmates are provided soap and hygiene items during shower and recreation time and, upon request, inmates are provided with soap, towels, and toilet paper for use in the cell, with the toilets flushed by correctional officers. (D.I. 228, ex. 3 at ¶ 5; D.I. 240 at ex. A, Phelps Request for Admissions Nos. 2, 4) C-Building does not have an outdoor recreation area, but its inmates are provided with indoor recreation, three times a week for an hour. (Id. at ¶ 6) During that time, the inmate can shower and use the time for recreation. (Id.)

Plaintiff's right shoulder and right elbow were x-rayed on January 8, 2010, and the results were within normal limits. (D.I. 225, A534-36) Plaintiff complained of right arm, elbow, and shoulder pain in February and March 2010 and was seen after each complaint. (D.I. 238 at A295, A356) Consultation requests for physical therapy were approved in March and June 2010, with both requests ordering physical therapy two times per week for six weeks. The requests included teaching exercises on physical therapy days and a reevaluation of plaintiff by the provider in six weeks. (D.I. 238 at A174, 181)

On June 16, 2010, plaintiff underwent an MRI of the right shoulder.[9] (D.I. 238 at A644) Impression included tendinosis/tendinopathy of the rotator cuff tendon complex;

---

[9]Plaintiff testified that he had suggested he be given an MRI based upon a recommendation by a physical therapist and radiologist, but one was not performed even though it was needed. (Id. at 126) According to plaintiff, the results of the MRI indicated surgery. (Id. at 127)

8

degenerative/stress related change involving the acromioclavicular joint articulation; mild subdeltoid bursal inflammation; and evidence of degenerative change with minimal fibrillation and blunting of the glenoid[10] labrum in the posterosuperior quadrant. (Id.)

On July 1, 2010, CCS became the medical service provider for DOC institutions, serving as the general healthcare provider. See Williamson v. Correct Care Services LLC, 2010 WL 5260787 at n.4. On July 25 and 29, 2010, plaintiff complained of shoulder pain, and he was seen by medical on August 1, 2010. (D.I. 238 at A700, A702) On August 16, 2010, plaintiff was seen by an orthopedic specialist and given a cortisone injection for pain. (D.I. 191, ex. B at A698) The specialist found that plaintiff had degenerative changes and disruption of the A/C joint and indicated that plaintiff would need future surgery for a distal clavicle repair. (D.I. 238 at DuShuttle One) Plaintiff submitted a sick call slip on September 2, 1010, complaining that his cortisone injection had not worked and asked if his surgery could be expedited. (D.I. 191, ex. B at A698) The September 2, 2010 note states, "notes refer to consult it appears not have been done." (Id.) Plaintiff submitted sick call slips in October, November, and December 2010, and January and February 2011, complaining of arm and shoulder pain and asking why the surgery recommended had not been scheduled. ((D.I. 191, ex. B at A693, 691; D.I. 238 at A680, A685, A687) In October 2010, he was seen by a nurse and referred to a specialist for follow-up and consideration of surgery; he was seen by medical on November 24, 2010, said note reflecting an outside provider

---

[10]Relating to the articular depression of the scapula entering into the formation of the shoulder joint. The American Heritage Stedman's Medical Dictionary 332 (2d ed. 2004).

recommended surgery; and he was seen by medical personnel on December 29, 2010, January 1, 2011, and February 5 and 21, 2011. (D.I. 191, ex. B at A693, A717; D.I. 238 at A680, A683, A687, A691, A726) In January 2011, plaintiff was made aware that his pain medication had been renewed and, in February 2011, he was advised of the medical plan for an orthopedic consultation and that he would be referred to pain management until the consult was completed. (D.I. 238 at A683, A687)

Arthroscopic surgery was performed on March 9, 2011 by Dr. R. P. DuShuttle ("Dr. DuShuttle") who performed a resection labrum and distal clavicle. (D.I. 191 at A709, A716; D.I. 200 at A638) Diagnosis was degenerative arthritis of the right AC joint. (D.I. 200 at A638) Plaintiff was seen post-operatively by Dr. DuShuttle on March 21, 2011 and April 13, 2011. (D.I. 238 at A627, A632) On March 21, 2011, Dr. DuShuttle wrote an order for physical therapy. (Id. at A630)

Plaintiff was housed in the infirmary from March 8 to March 23, 2011. He testified that there was a policy that the door would not be opened for him based upon his status as a SHU inmate. (D.I. 412, ex. 1 at 33-34) To receive medical treatment, given that he had recently had surgery on his right arm, plaintiff was required to place his left arm/hand through the food slot which is three feet from the ground. (Id. at 33-36) Plaintiff testified that a correctional officer told a nurse that because plaintiff was in SHU she was not to open the door to his cell, but to treat him through the flap. (Id. at 112) Plaintiff testified that there was never a time when a nurse requested that a correctional officer take him out of the cell to receive treatment. (Id. at 167) Plaintiff relayed one incident when a nurse indicated that she needed to go into plaintiff's cell in

the infirmary and was told by a correctional officer, "absolutely not, you never open this door." (*Id.* at 168)

Pierce states that there is no policy preventing medical staff from entering the cell of a maximum security inmate who is housed in the infirmary. (D.I. 228, ex. 2, ¶ 3) For security reasons, when the door of a maximum security inmate's infirmary door is opened, three staff members must be present at the cell door. (*Id.*) If medical staff needs to enter a maximum security inmate's infirmary room, the medical staff should ask the correctional officer, who then escorts the medical staff into the infirmary room with two other officers. (*Id.*) Depending on the situation, the inmate may be restrained prior to the medical staff person entering the room. (*Id.*)

Plaintiff testified that, following his injuries and surgery, he was not provided ice for swelling and pain while housed in the infirmary. (D.I. 412, ex. 1 at 113, 136) He was told that "nobody in SHU was allowed to have ice." (*Id.*) Plaintiff did not know if that was a medical rule or a security rule. (*Id.* at 114) He testified that he asked everyone for ice, every nurse and every officer, but he could not recall their names. (*Id.* at 162) Medical records indicate that following the January 1, 2009 injury, plaintiff was given ice for his right hand, arm and elbow and a heat pack for his right lumbar region (D.I. 225 at A275, A326), and that he was given an ice pack (in conjunction with pain medication) following his June 1, 2001 injury (*id.* at A318). Medical records indicate that following the March 9, 2011 surgery, physician's orders were written for plaintiff to apply ice fifteen minutes to an hour for the first two days. (D.I. 200 at A662) Medical records reflect that plaintiff was given ice packs on March 9 and March 10, 2011. (D.I. 191 at A715-716)

11

Pierce states that there is no policy that a maximum security inmate who is housed in the infirmary cannot have ice to treat swelling. (D.I. 228, ex. 2, at ¶ 4) If an inmate has a medical need for ice, the medical contractor has a duty to provide ice. (Id.) Maximum security inmates housed in SHU or in the infirmary are not allowed to obtain ice for non-medical use. (Id.)

There is no policy that maximum security inmates housed in the infirmary cannot have recreation. (Id. at ¶ 5) However, there is a policy that inmates of different classifications cannot co-mingle and, because the infirmary contains a mixture of classified inmates, for security reasons, maximum security inmates in the infirmary are not sent to recreation. (Id.) If there is a medical need for recreation, based on a doctor's order, a maximum security inmate in the infirmary can receive recreation or physical therapy as directed by the physician. (Id.) Maximum security inmates in the infirmary are allowed to shower and, according to Pierce, there is no policy that prevents them from showering. (Id. at ¶ 6) Maximum security housed in the infirmary are not prevented from using the phone but they have less access due to their privilege levels and, for security reasons, there is an unwritten practice that prevents an inmate in the infirmary from making telephone calls when being taken from the institution to an outside medical facility. (Id. at ¶ 7)

Following surgery, Dr. DuShuttle ordered pain medication to be administered to plaintiff twice daily for seven days. (D.I. 191, ex. B at A637) A second prescription for a different form of pain medication was written on March 21, 2011 to be given to plaintiff over the next 21 days. (Id. at A658) DOC medical records indicate that orders were

written for pain medication on March 21, 22, and 23, 2011.[11]  (D.I. 238 at A659)  Plaintiff
was seen by medical following the surgery on an almost daily basis until March 23,
2011.  (*Id.* at A710-16)  When plaintiff ran out of "extra strength" pain medication, he
submitted a sick call slip on March 30, 2011 complaining that it should not have
happened and was advised that his order was good until April 15, 2011.  (D.I. 191, ex. B
at A678)

On April 8, 2011, plaintiff wrote to Dr. Desrosiers advising that the orthopedic
specialist "anticipated the pain will increase steadily" as plaintiff regained motion in his
shoulder and it began to heal over the next three to six months.  According to plaintiff,
his surgeon ordered pain medication to be administered twice daily during that time
period.  (*Id.* at A676)  Plaintiff requested that his pain medication be continued until he
could see the orthopedic specialist.  (*Id.*)  Plaintiff submitted a second sick call on April
16, 2011, stating that his surgeon wrote an order that must not have been delivered to
Dr. Desrosiers, that the order indicated that his pain was expected to worsen, and
requested the order be given to Dr. Desrosiers.  (*Id.* at A674)  Dr. Desrosiers spoke to
Dr. DuShuttle on April 25, 2011 regarding plaintiff's statement regarding his level of pain
and the continued need for the pain medication.  Dr. Desrosiers stated that Dr.
DuShuttle "never said [plaintiff's] pain was going to get worse," and indicated that the

---

[11]Plaintiff was told by unnamed inmates that the medical director slashes
inmates' orders for medication in half.  (D.I. 412, ex. 1 at 46-47)  Plaintiff testified that
Dr. DuShuttle also told him that medical cut his orders every time.  (*Id.* at 48)  Plaintiff
testified that nurses told him that the medical director has the option of changing
prescriptions.  (*Id.* at 51)  Plaintiff believes that CMS had such a policy and that CCS
maintained the policies of its predecessor, has no documented proof of this, but testified
there is a practice  or custom of allowing medication to run out to save money.  (*Id.* at
54, 57, 67-68, 105)

pain medication should have been only necessary for approximately 21 days post-surgery. (*Id.* at A674)

On April 18, 2011, CCS requested an outpatient referral for assessment and treatment as the "ortho requests to start PT ASAP." (D.I. 238 at A623) CCS progress notes reveal that plaintiff was seen on March 29, April 28, May 10, Mary 24 and June 9, 2011 and that plaintiff was performing range of motion and strengthening exercises. (D.I. 128, at A83) Plaintiff testified that he did not regularly receive physical therapy as ordered by his physicians. (D.I. 412, ex. 1 at 40-41, 106) He was told that inmates housed in SHU did not receive physical therapy as often as inmates on the compound because of scheduling issues and the number of correctional officers, but he did not know who scheduled the inmates for the required physical therapy or who had the final decision making to schedule therapy sessions. (*Id.* at 41) He testified that the physician also ordered exercises that plaintiff could perform on his own in his cell and a physical therapist showed plaintiff how to perform range of motion activities. (D.I. 412, ex. 1 at 84, 171) At the time of his deposition, plaintiff testified that he had range of motion in his shoulder because he "took it upon [himself] to rehabilitate . . . and [he] had to work hard to get [his] strength." (D.I. 412, ex. 1 at 45)

Plaintiff testified that neither of the medical care providers provided medical care until after he submitted grievances seeking treatment.[12] (*Id.* at 118) Plaintiff testified

_____

[12]During the time that CMS was the medical health care provider, plaintiff submitted grievances complaining of needed medical care, pain medication, physical therapy on January 9, 10, 17, 2009, November 28, 2009, December 13, 2009, April 26, 2010, and May 20, 2010. (D.I. 237 at B3, B4, B6, B14, B21, B30, B36, B44, B50, B53) Plaintiff submitted grievances with regard to CCS medical care and/or needed medication on October 15, 2010, March 24, 2011, and April 16, 2011 (D.I. 237 at B64,

14

that the medical service providers have a practice of delaying medical care to the furthest possible time. (*Id.* at 125) He testified that the delay in his surgery from the time he was injured in 2009, until the 2011 surgery, is attributable to CMS and CCS. (*Id.* at 119-120)

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (citations omitted). In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (citing *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990)).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will

---

B77, B83, B85)

"view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).  The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Defendants CMS, Bryant, and Damron (collectively "CMS defendants") move for summary judgment on the grounds that plaintiff failed to:  (1) develop any evidence to establish a constitutional violation of his rights as a result of the medical care he received; and (2) develop any evidence to establish the deprivation of a liberty interest sufficient to warrant due process protection.[13]  Defendant CCS moves for summary judgment on the grounds that plaintiff:  (1) failed to produce evidence to support the necessary elements of an Eighth Amendment claim; (2) produce the necessary medical expert opinion to establish his claims of negligent medical care; and (3) cannot show that he was deprived of a liberty interest covered by the Fourteenth Amendment. Defendants Danberg, Phelps, Pierce, Costello, Rispoli, Klein and Doe (collectively State

---

[13]The CMS defendants' motion for summary judgment filed contains the affidavit of Dr. Dale Rodgers ("Dr. Rodgers").  (D.I. 223, ex. E)  The affidavit is not dated, nor is it signed by a notary public.  Therefore, the court does not consider Dr. Rodgers' affidavit.

defendants") move for summary judgment on the grounds that: (1) the claims against them in their official capacities are barred by the Eleventh Amendment; and (2) they are entitled to qualified immunity because plaintiff has failed to demonstrate their personal involvement in the alleged deprivation of his rights.  Plaintiff opposes the motions.

## IV. DISCUSSION

### A. Eleventh Amendment

Plaintiff names State defendants in their official capacities.  While not clear, it appears that plaintiff argues the issue of Eleventh Amendment immunity should have been resolved early on and, because it was not, immunity is waived.

The Eleventh Amendment of the United States Constitution protects an unconsenting State or state agency from a suit brought in federal court by one of its own citizens, regardless of the relief sought.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984); *Edelman v. Jordan*, 415 U.S. 651 (1974).  "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citations omitted); *Ali v Howard*, 353 F. App'x 667, 672 (3d Cir. 2009) (unpublished).  Accordingly, § 1983 claims for monetary damages against a State, state agency, or a state official in his official capacity are barred by the Eleventh Amendment.  *See id.*

However, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law.  *See Ex parte Young*, 209 U.S. 123 (1908).  "This standard allows courts to order prospective relief, as well as

17

measures ancillary to appropriate prospective relief." *Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (internal citations omitted).

Plaintiff's claims for injunctive relief are moot given that he is no longer housed in the VCC. *See Abdul-Akbar v. Watson*, 4 F.3d 195, 197 (3d Cir. 1993). In addition, as will be discussed, the record does not support a finding that State defendants acted in violation of federal law to warrant injunctive relief. Finally, the State of Delaware has neither consented to plaintiff's suit nor waived its immunity. Therefore, the court will grant State defendants' motion for summary judgment as to the claims raised against them in their official capacities.

### B. Eighth Amendment

#### 1. Medical needs

All defendants move for summary judgment on the grounds that plaintiff has not established Eighth Amendment violations. Plaintiff argues that summary judgment is not proper because CMS has a history of providing inadequate medical care and it delayed and denied him required medical care.[14] With regard to Bryant, plaintiff argues she did not examine his elbow, did not provide medical treatment, and did not provide

---

[14]Plaintiff relied upon an investigation that the Civil Rights Division of the United States Department of Justice ("USDOJ") conducted of five Delaware prison facilities pursuant to the Civil Rights of Institutionalized Persons Act, which authorizes the federal government to identify and root out systemic abuses. (D.I. 237, ex. 11) The investigation found substantial civil rights violations at four of the five facilities: Delores J. Baylor Women's Correctional Institution, Howard R. Young Correctional Institution, Delaware Correctional Center (now known as the VCC), and Sussex Correctional Institution. The investigation resulted in the entry of a memorandum of agreement on December 29, 2006, between the USDOJ and the State of Delaware regarding the four institutions. Paragraph I.F. of the agreement provides that it may not be used as evidence of liability in any other legal proceeding. (*Id.* at ¶ 1.F.)

18

him access to a physician.  He further argues that summary judgment is not proper

because CCS is responsible for failing to follow his orthopedic surgeon's orders (i.e.,

needed physical therapy and required medications) and because he was required to

receive treatment through a hole close to the floor of a cell door.  Finally, plaintiff argues

that summary judgment is not proper because State defendants enacted deficient

policies which resulted in constitutional violations.

The Eighth Amendment proscription against cruel and unusual punishment

requires that prison officials provide inmates with adequate medical care.  *Estelle v.*

*Gamble*, 429 U.S. 97, 103-105 (1976).  In order to set forth a cognizable claim, an

inmate must allege (i) a serious medical need and (ii) acts or omissions by prison

officials that indicate deliberate indifference to that need.  *Estelle v. Gamble*, 429 U.S. at

104.  Serious medical needs are those that have been diagnosed by a physician as

requiring treatment or are so obvious that a lay person would recognize the necessity

for medical attention, and those conditions which, if untreated, would result in a lifelong

handicap or permanent loss.  *See Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834

F.2d 326, 347 (3d Cir. 1987).  Deliberate indifference requires more than mere

negligence or lack of due care.  *See Farmer v. Brennan*, 511 U.S. 825, 835  (1994).  To

demonstrate deliberate indifference, the plaintiff must demonstrate that the defendant

was "subjectively aware of the risk" of harm to the plaintiff.  *See Farmer*, 511 U.S. at

828.  The plaintiff must allege acts or omissions that are sufficiently harmful to offend

"evolving standards of decency."  *Estelle v. Gamble*, 429 U.S. at 106.

"Mere medical malpractice cannot give rise to a violation of the Eighth Amendment." *White v. Napoleon*, 897 F.2d 103, 108 (3d Cir. 1990). In addition, an inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Id.* at 107.

The record reflects that plaintiff has a serious medical need, having sustained injuries in January and June 2009 and ultimately undergoing surgery in March 2011. The record further demonstrates that plaintiff was provided with ongoing care. Plaintiff was injured on January 1, 2009 and, on that day, transported to the hospital for treatment. Upon his return from the hospital, he remained in the prison infirmary for approximately one week where he received care and treatment. He was seen by medical personnel on a fairly regular basis prior to the reinjury in June 2009 and throughout 2009, 2010 and 2011. The record is replete with documentation showing that plaintiff was provided with medical care at the prison, referrals to outside specialists, treatment by outside specialists, diagnostic testing, and surgery.

Surgery was ultimately performed on plaintiff's shoulder in 2011, it appears, after attempts of more conservative treatment, such as physical therapy and cortisone injections, failed. Recommendations that plaintiff undergo physical therapy were approved, but there were delays in receiving the therapy. Nonetheless, the record reflects that plaintiff received some physical therapy and that he was given a regimen of exercises to perform. Indeed, plaintiff testified that he had range of motion in his shoulder because he had worked hard to regain his strength. At most, CMS defendants

20

and CCS were negligent in plaintiff's delay in receiving physical therapy.  Negligence, however, does not rise to the level of a constitutional violation.  Plaintiff also complains of the frequency and amounts of pain medication provided.  The record indicates that plaintiff received pain medication, but not the dosages he mistakenly believed had been prescribed him.  Finally, plaintiff complains that he was required to receive medical treatment through a slot in the cell door.  While this may have not been the most professional manner in which to provide medical treatment, plaintiff did in fact receive treatment, regardless of how unorthodox the method may have been.  Hence, it cannot be said defendants were  deliberately indifferent to plaintiff's medical needs.

Plaintiff also complains of treatment he received at the hands of Bryant.  The medical records indicate that Bryant examined plaintiff and found no sign of infection.  Moreover, she recommended that plaintiff receive another x-ray to rule out a fracture.  Although an infection was discovered a few days later, Bryant's failure to discover the infection, at most, lies in negligence, not deliberate indifference.

The evidence of record does not indicate that any State defendants had involvement in plaintiff's medical care.  *See Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007).  A defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved."  While plaintiff points to a number of DOC policies, none of the identified policies are responsible for plaintiff's perceived constitutional violations.

Further, it is well-established that non-medical prison staff may not be "considered deliberately indifferent simply because they failed to respond directly to the

medical complaints of a prisoner who was already being treated by the prison doctor."

*Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993). The rationale for this rule has been

aptly explained by the United States Court of Appeals for the Third Circuit in the

following terms:

> If a prisoner is under the care of medical experts . . . , a non-medical
> prison official will generally be justified in believing that the prisoner is in
> capable hands. This follows naturally from the division of labor within a
> prison. Inmate health and safety is promoted by dividing responsibility for
> various aspects of inmate life among guards, administrators, physicians,
> and so on. Holding a non-medical prison official liable in a case where a
> prisoner was under a physician's care would strain this division of labor.
> Moreover, under such a regime, non-medical officials could even have a
> perverse incentive not to delegate treatment responsibility to the very
> physicians most likely to be able to help prisoners, for fear of vicarious
> liability. Accordingly, we conclude that, absent a reason to believe (or
> actual knowledge) that prison doctors or their assistants are mistreating
> (or not treating) a prisoner, a non-medical prison official . . . will not be
> chargeable with the Eighth Amendment scienter requirement of deliberate
> indifference.

*Spruill v. Gillis*, 372 F.3d at 236. Courts have repeatedly held that, absent some reason

to believe that prison medical staff are mistreating prisoners, non-medical corrections

staff who refer inmate medical complaints to physicians may not be held personally

liable for medically-based Eighth Amendment claims. *See Spruill*, 372 F.3d 218;

*Durmer*, 991 F.2d 64.

Although plaintiff disagrees with the frequency and type of care and treatment he

received, "mere disagreement as to the proper medical treatment" is insufficient to state

a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004)

(citations omitted). In light of the extensive medical care provided plaintiff, no

reasonable jury could find that defendants were deliberately indifferent to plaintiff's

medical needs.

The record does not support a finding that defendants were deliberately indifferent to plaintiff's medical needs or that they violated plaintiff's constitutional rights. Instead, the record indicates that steps were taken to see that plaintiff received constitutionally adequate medical care. Therefore, the court will grant defendants' motions for summary judgment on the medical needs issue.

### 2. CMS and CCS policies

With regard to CMS and CCS, in order to establish that either one of them is directly liable for any alleged constitutional violations, plaintiff "must provide evidence that there was a relevant [] policy or custom, and that the policy caused the constitutional violation[s] [plaintiff] allege[s]." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories).

Because the court has concluded that there was no violation of plaintiff's constitutional rights under the Eighth Amendment, neither CMS nor CCS can be liable based on the theory that they established or maintained an unconstitutional policy or custom responsible for violating plaintiff's rights. *See Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 113 (3d Cir. 2007) (unpublished) (policy makers not liable in prison medical staff's alleged deliberate indifference to prisoner's serious medical needs where, given that there was no underlying violation of prisoner's rights, policy makers did not establish or maintain an unconstitutional policy or custom responsible for

23

violating prisoner's rights).  In light of the foregoing, the court will grant the motions for summary judgment of CMS and CCS as to plaintiff's medical needs claims.

## C. Due Process

Plaintiff alleges his right to due process was violated when, because of his security classification, he was subjected to conditions significantly worse than other inmates under similar circumstances.  More particularly, plaintiff alleges that he was refused treatment while housed in isolation, and medical personnel refused to enter his cell to provide treatment when he was housed in the infirmary.  CMS defendants move for summary judgment on the grounds that:  (1) security mandates dictate housing assignments and an inmate's access to items; and (2) plaintiff has failed to point to any DOC policy that places a burden upon the medical provider to treat inmates differently based upon their housing status.  CCS moves for summary judgment on the grounds that:  (1) any claims plaintiff raises under due process are based upon DOC policies for the security of the institution, not CCS policies; and (2) because plaintiff's due process claims are also covered by his Eighth Amendment claims, the due process claims are duplicative and should be dismissed.  State defendants move for summary judgment on the grounds that they had no personal involvement in the alleged constitutional violations and they cannot be held liable under a theory of respondeat superior.

A constitutionally-protected interest may arise either from the Due Process Clause itself, or from a statute, rule, or regulation.  *Hewitt v. Helms*, 459 U.S. 460, 466 (1983).  In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court recognized that, under certain circumstances, states may create liberty interests protected by the Fourteenth Amendment due process clause.  In the prison context, "these interests will

be generally limited to freedom from restraint which . . . while not exceeding the

sentence in such an unexpected manner as to give rise to protection by the Due

Process Clause of its own force, nonetheless imposes atypical and significant hardship

on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.  In deciding

whether a protected liberty interest exists, a federal court must consider the duration of

the disciplinary confinement and the conditions of that confinement in relation to other

prison conditions.  *See Mitchell v. Horn*, 318 F.3d 523, 532 (3d Cir. 2003) (citing *Shoats

v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000)).  Absent a protected interest, substantive due

process is not implicated.  Finally, if a constitutional claim is covered by a specific

constitutional provision, such as the Eighth Amendment, the claim must be analyzed

under the standard appropriate to that specific provision, not under the rubric of

substantive due process.  *Cooleen v. Lamanna*, 248 F. App'x 357, 361 (3d Cir. 2007)

(unpublished) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998); *see

also Graham v. Poole*, 476 F. Supp. 2d 257 (W.D.N.Y. 2007) (holding that when a

prisoner's "deliberate indifference claim is covered by the Eighth Amendment, the

substantive due process claims are duplicative" and thus "the substantive due process

claims [should be] dismissed") (quotations and citations omitted).

There is no evidence of record that plaintiff was treated differently than other

inmates with the same security classification who had medical needs whether housed in

isolation or the infirmary.  Plaintiff's confinement in isolation and the infirmary did not

exceed similar, but totally discretionary confinement in either duration or degree of

restriction.  *Sandin*, 515 U.S. at 486.  In addition, plaintiff's periods of confinement in

isolation and the infirmary were for very short period of time.  *See Griffin v. Vaughn*, 112

F.3d 703 (3d Cir. 1997) (administrative custody placement for a period of fifteen months was not an atypical and significant hardship).  Moreover, DOC policies were implemented for the safety and security of the prison.  Even if medical personnel somehow misconstrued the policies, it cannot be said that they violated plaintiff's constitutional rights.

Finally, plaintiff's Eighth Amendment claims, including the medical needs claims and conditions of confinement claims, are duplicative of the Fourteenth Amendment claims. As discussed above, plaintiff received adequate medical care.  *See e.g.,* *Cooleen v. Lamanna*, 248 F. App'x 357 (3d Cir. 2007) (unpublished) (finding that an inmate cannot show the violation of a constitutionally protected liberty interest when he received medical treatment).  Even were the claims not duplicative, the DOC policies that plaintiff finds objectionable are based upon his SHU housing status, are the same for inmates with his same security classification, and implemented for the safety and the security of the institution.  Prison officials require broad discretionary authority as the "operation of a correctional institution is at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974).  Hence, prison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices that are needed to preserve internal order and to maintain institutional security.  *Bell v. Wolfish*, 441 U.S. 520, 527 (1979).

For the above reasons, the court will grant defendants' motions for summary judgment on the due process issue.

26

## D. Conditions of Confinement

State defendants move for summary judgment on the grounds that they had no personal involvement in the alleged constitutional violations and they cannot be held liable under a theory of respondeat superior. Plaintiff argues that State defendants are responsible for the unconstitutional conditions of confinement he was subjected to in the infirmary and in SHU.[16]

A condition of confinement violates the Eighth Amendment only if it is so reprehensible as to be deemed inhumane under contemporary standards or such that it deprives an inmate of minimal civilized measure of the necessities of life. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). When an Eighth Amendment claim is brought against a prison official, it must meet two requirements: (1) the deprivation alleged must be, objectively, sufficiently serious; and (2) the prison official must have been deliberately indifferent to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. at 834. Deliberate indifference is a subjective standard in that the prison official must actually have known or been aware of the excessive risk to inmate safety. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001).

As to the isolation unit, plaintiff alleges unlawful conditions of confinement when he was: (1) denied exercise; (2) denied medical treatment; (3) subjected to invasive strip searches during a twelve day period; (4) denied hygienic items and clothing other than boxer shorts and a t-shirt; (5) was cuffed behind his back at sick call appointments;

---

[16]A conditions of confinement claim is not raised against the medical defendants.

27

and (6) required to buy pain medication from the infirmary. With regard to the conditions of confinement in the infirmary, plaintiff alleges that he was subjected to cruel and unusual punishment when he was: (1) forced to receive medical treatment by sticking his arm out of the food slot; (2) denied extra blankets or clothing while in freezing conditions; (3) denied ice following his injuries and post-surgery; (4) denied a shower; (5) could not make a phone call; and (6) denied recreation.

Plaintiff bases his claims on alleged VCC policies that State defendants instituted or maintained and argues that, by reason of DOC policies, liability may attach to State defendants. Plaintiff argues his claims are directly linked to State defendants given DOC's policies that: (1) the DOC's function is to ensure proper performance by the medical defender; (2) institutional authority shall work in conjunction with the medical director in cases where security and control of the offender are issues; (3) all policies are available for viewing on the DOC website; (4) prescreening is specified for any isolation period; (5) the medical director has the overall responsibility for the quality of care in the infirmary; and (6) procedures should be developed that assure offenders remain free from capricious searches. (See D.I. 240, ex. B at 408 V.I., 410 V.2., 420 V.3.; 511-514; 528-531; 561, 566)

The record does not reflect that there are policies that prevent inmates in isolation from receiving medical treatment. Notably, the record reflects that plaintiff received medical care while in isolation. In addition, relevant policies provide that inmates are assessed by medical before being placed into isolation and, every shift, inmates in isolation are checked by supervisors. In addition, inmates may submit sick call slips when they are in isolation. Inmates in isolation are allowed out-of-cell time,

28

three times a week for an hour, to recreate and/or shower.  For security reasons, inmates receive hygienic items upon request.  Also, for security reasons, inmates in isolation are searched once on every shift.

With respect to the infirmary claims, the VCC policies do not prevent: (1) medical staff from entering a SHU inmate's infirmary cell when a correctional officer is present; (2) SHU inmates from using ice to treat swelling when there is a medical need;[17] (3) SHU inmates from recreation with inmates who have the same security classification; (4) SHU inmates from showering; (5) maximum security housed inmates in the infirmary from making telephone calls with the exception that phone calls are not allowed when an inmate leaves for outside medical treatment; and (6) any inmate from receiving an extra blanket when warranted due to problems with the heat.

Although plaintiff's housing status may have caused harsher conditions in the infirmary and the conditions in isolation are harsher than other housing assignments, they do not constitute a denial of "the minimal civilized measures of life's necessities." See, e.g., Williams v. Delo, 49 F.3d 442, 444-47 (8th Cir. 1995) (holding no Eighth Amendment violation where prisoner was placed in a strip cell without clothes, the water in the cell was turned off and the mattress removed, and prisoner's bedding, clothing, legal mail, and hygienic supplies were withheld).  Indeed, there is no evidence of record that plaintiff was denied basic human needs such as clothing, food, shelter, sanitation, medical care, and personal safety.  Rather, his complaint's revolve around temporary

---

[17]Contemporaneous medical records indicate that plaintiff was provided ice packs following his January 1, 2009 injury, his June 1, 2009 injury, and for two days following his March 9, 2011 surgery.

restrictions based upon his security classification. Finally, there is no evidence of personal involvement by any named State defendant as to the conditions of confinement claims, or that prison officials knew of, and disregarded, an excessive risk to plaintiff's health or safety. *See Beers-Capitol*, 256 F.3d at 125.

Plaintiff may have found his temporary conditions of confinement uncomfortable, but they were no different than those afforded to other inmates temporarily housed in the infirmary or in isolation with the same security classification. *See e.g., Griffin v. Vaughn*, 112 F.3d 703 (3d Cir. 1997). Plaintiff failed to raise a genuine issue of material as to whether his conditions of confinement were cruel and unusual punishment. Therefore, the court will grant State defendants' motion for summary judgment as to this claim.

### E. Assault and Battery

Damron moves for summary judgment on the issue of assault and battery. Plaintiff opposes the motion on the grounds that there remain issues of fact.

The tort of assault and battery is defined in Delaware as "the intentional, unpermitted contact upon the person of another which is harmful or offensive." *Brzoska v. Olson*, 668 A.2d 1355, 1360 (Del. 1995) (citations omitted). Lack of consent is an essential element of assault and battery. *Brzoska*, 668 A.2d at 1360. The intent necessary for battery is the intent to make contact with the person, not the intent to cause harm. *Id.* (citations omitted). Also, the contact need not be harmful; it is sufficient if the contact offends the person's integrity. *Id.* (citations omitted). "In order for a contact to be offensive to a reasonable sense of personal dignity, it must be one which would offend the ordinary person and as such one not unduly sensitive as to his

personal dignity. It must, therefore, be a contact which is unwarranted by the social usages prevalent at the time and place at which it is inflicted." (Id.) The propriety of the contact is therefore assessed by an objective "reasonableness" standard. See In re Taylor v. Barwick, 1997 WL 527970, at *3 (Del. Super. Ct. Jan. 10, 1997).

There is no evidence that plaintiff did not consent to the contact by Damron. Rather, the evidence is that he sought physical therapy. In addition, the acts complained of occurred in a medical setting, at the direction of a physician, and while plaintiff was housed in the infirmary. Damron states that she did not intend to cause plaintiff harm, while plaintiff testified that she yanked his arm and it hurt. Plaintiff presented no evidence that physical therapy exercises were performed incorrectly.

Viewing the evidence as a while, the acts taken by Damron were objectively reasonable. Therefore, the court will grant the motion for summary judgment on the issue of assault and battery.

## V. CONCLUSION

For the above reasons, the court will grant defendants' motions for summary judgment. (D.I. 222, 224, 226) In addition, the court will dismiss the Doe defendants for plaintiff's failure to identify them and/or to serve them.

An appropriate order will issue.

31